**KAISER STEEL CORPORATION,**
Petitioner-Appellant,

v.

**DIRECTOR, OFFICE OF WORKERS' COMPENSATION PROGRAMS, UNITED STATES DEPARTMENT OF LABOR and Alfonso Sena, Respondents-Appellees.**

No. 83–2273.

United States Court of Appeals,
Tenth Circuit.

March 21, 1985.

Paul A. Kastler of Kastler Law Offices, Ltd., Raton, N.M., for petitioner-appellant.

Barbara J. Johnson, U.S. Dept. of Labor, Washington, D.C. (Francis X. Lilly, Karen I. Ward, Allen H. Feldman, and Heidi Ann Lazar-Meyn, U.S. Dept. of Labor, Washington, D.C., with her on the brief), for respondent-appellee, Director, Office of Workers' Compensation Programs, U.S. Dept. of Labor.

Edward J. Scheunemann, Denver, Colo., for respondent-appellee, Alfonso Sena.

Before BARRETT and McKAY, Circuit Judges, and ELLISON,* District Judge.

BARRETT, Circuit Judge.

Kaiser Steel Corporation (Kaiser Steel) seeks judicial review of a December 3, 1980, order by an Administrative Law Judge (ALJ) in the Office of Workers' Compensation Programs, Department of Labor, awarding disability benefits to Alfonso Sena, a former coal miner and employee of Kaiser Steel. The award was made pursuant to Title IV of the Federal Coal Mine Health and Safety Act of 1969, as amended,[1] now codified at 30 U.S.C. §§ 901–945 (1982) (the Act). The ALJ's award was affirmed by an unpublished per curiam opinion of the Benefits Review Board (BRB No. 80–1599 BLA, OWCP No. 525–22–6827), and Kaiser Steel petitions this Court for review in accordance with 30 U.S.C. § 932(a) (1982).

Alfonso Sena was employed by Kaiser Steel as an underground coal miner from 1945 to 1954 and from 1959 to 1976, for a total of twenty-six years. Emp.Exh. J. He began experiencing health problems and filed for benefits on September 17, 1975, a few months before his retirement in January, 1976.

On July 26, 1979, the Director of Office Workers' Compensation Programs issued an initial finding that Sena was entitled to disability benefits under the Act and that Kaiser Steel was liable to pay those benefits as the responsible operator. Kaiser Steel contested liability, and the matter was forwarded to an ALJ for a formal hearing. A summary of the medical evidence presented to the ALJ follows:

*Chest X-rays:*

1. X-ray dated December 12, 1975. The X-ray was examined by Dr. R.J. Benjamin, and "was recorded as consistent with minimal pneumoconiosis." Dir.Exh. 11. Examined by "B"-reader[2] Dr. E.N. Sargent, who recorded a 2/1 profusion of type q small, rounded opacities. Dir. Exh. 13. These results establish the existence of pneumoconiosis under 20 C.F.R. § 410.428 (1984).

2. X-ray dated February 20, 1979. Examined by Dr. L.L. Cohen, who noted a showing of "chronic lung disease." Examined by "B"-reader Dr. E.N. Sargent, who recorded a 1/1 profusion of type q small, rounded opacities. Dir.Exh. 14. These results also establish the existence of pneumoconiosis under 20 C.F.R. § 410.428 (1984).

3. X-ray dated March 9, 1979. Examined by Dr. D. O'Connor, who noted "[m]ultiple small nodules scattered throughout both lung fields showing little significant

---

* The Honorable James O. Ellison, United States District Judge for the Northern District of Oklahoma, sitting by designation.

1. Title IV of the Federal Coal Mine Health and Safety Act of 1969, Pub.L. No. 91–173, 83 Stat. 792, has been amended by the Black Lung Benefits Act of 1972, Pub.L. No. 92–303, 86 Stat. 150, the Black Lung Benefits Reform Act of 1977, Pub.L. No. 95–239, 92 Stat. 95, and the Black Lung Benefits Amendments of 1981, Pub.L. No. 97–119, 95 Stat. 1635. These acts and amendments are commonly known collectively as the "Black Lung Benefits Act."

2. A "B"-reader is a physician who has passed a proficiency examination demonstrating the highest level of proficiency in interpreting chest X-rays for evidence of pneumoconiosis. See 42 C.F.R. § 37.51 (1984).

change from 2/20/79 . . . ." Emp.Exh. C, p. 4.

*Ventilatory Tests* [3]

1. Test date: December 19, 1975.
   Miner's height: 172.7 cm.
   Pre-bronchodilator $FEV_1$: 2.83 L
   Pre-bronchodilator MVV: 129.11 L/M
   Post-bronchodilator $FEV_1$: 2.85 L
   Post-bronchodilator MVV: 117.98 L/M
   The testing technician noted that "Patient appeared to understand and cooperate well." Estimate of patient effort was noted as "good." Dir.Exh. 10, p. 8.

2. Test date: February 22, 1979
   Miner's height: 69"
   Pre-bronchodilator $FEV_1$: 2.26 L
   Pre-bronchodilator MVV: 58 L/M
   Post-bronchodilator $FEV_1$: 2.40 L
   Post-bronchodilator MVV: 67 L/M
   The testing technician noted "good" effort. Dir.Exh. 10, p. 1.

3. Test date: December 4, 1979
   Miner's height: 68"
   Pre-bronchodilator $FEV_1$: 2.14
   Pre-bronchodilator MVV: 92
   Post-bronchodilator $FEV_1$: 2.35
   Post-bronchodilator MVV: 97
   The testing technician noted "best" effort on the FEV tests and "good" effort on the MVV test. Emp.Exh. D–4.

*Blood gas test:*

1. Test date: February 20, 1979
   $PCO_2$: 31.9
   $PO_2$: 57.6

*Medical Examinations, Reports, and Testimony:*

1. Dr. Neil M. Goldberg examined the claimant on December 12, 1975. His report notes the claimant's history of persistent coughing, shortness of breath, and inability to walk more than a block without dyspnea (difficult or labored respiration). Dr. Goldberg referred to the December 12, 1975, X-ray as "recorded as being consistent with minimal pneumoconiosis." His conclusion: "At the present time, the patient shows findings on physical and laboratory evaluation, consistent with obstructive lung disease." Dir.Exh. 11. Dr. Goldberg did not testify at the hearing.

2. Dr. Charles A. Riley examined the claimant at the request of the Department of Labor on February 20, 1979. Dr. Riley's report notes the claimant's history of coughing, phlegm production, shortness of breath, supine dyspnea and exertional chest pain. The report diagnosed chronic bronchitis and possible angina pectoris, with the diagnosed condition not related to the claimant's coal mine employment. Dir.Exh. 12. Dr. Riley also testified at the hearing that, on the basis of the ventilatory tests, the claimant has a pulmonary impairment in the form of restrictive lung disease. He referred to an earlier report in which he had speculated that the etiology (cause) of the pulmonary function test might be chest bellows disease, a condition where the patient's obesity prevents his chest cage from expanding fully. Tr. 28–29. Counsel for Kaiser Steel gave Dr. Riley a somewhat abridged version of the definition of "pneumoconiosis" found at 20 C.F.R. § 727.202, then asked him if, by that definition, Mr. Sena had pneumoconiosis. Dr. Riley responded, "I don't believe so." Tr. 24. However, when Dr. Riley was asked on cross-examination whether a claimant had pneumoconiosis, assuming, hypothetically, that the claim-

---

3. These ventilatory tests are known as "spirometry." Each of these tests was divided into two parts, conducted before and after bronchodilator drugs were administered to the test subject. The term "$FEV_1$," refers to forced expiratory volume, the maximum amount of air, measured in liters that the subject can expel from his or her lungs in one second. The term "MVV" refers to maximum ventilatory volume, the amount of air expelled during one minute of maximum repetitive effort. These tests are recognized to be "effort-dependent," meaning that results will be inaccurately low if the test subject does not expend maximum effort. The test subject's effort is a matter of subjective evaluation by the technician present. *See generally* Lapp, *A Lawyer's Medical Guide to Black Lung Litigation,* 83 W.Va.L.Rev. 721 (1981).

ant had twenty years' experience in the coal mines and a chest X-ray with a "2/1" reading, along with the information Dr. Riley already knew about Sena, Dr. Riley responded that with "no uncertainty," the claimant would have pneumoconiosis. Tr. 34.

3. Dr. H.W. Pinkerton, the claimant's family physician, examined him on March 6, 1979. His short report notes complaints of shortness of breath and coughing, and a diagnosis of "moderate restrictive lung disease." Emp.Exh. A. Dr. Pinkerton did not testify at the hearing.

4. Dr. Armin T. Keil examined the claimant at the request of Kaiser Steel on November 8, 1979. His report notes the familiar claimant's history of coughing, phlegm production, and shortness of breath. Emp.Exh. J. He testified at the hearing that the claimant did not have pneumoconiosis if such were defined as an impairing disease, but he did have pneumoconiosis by Dr. Keil's own definition and by the presumption in the regulations. Tr. 64–65, 77. This apparent inconsistency was explained by Dr. Keil's opinion that simple pneumoconiosis is not disabling or impairing. Tr. 47, 79.

Based on all of this medical evidence and on Sena's twenty-five years of experience as a coal miner, the ALJ found that the "interim presumption"[4] at 20 C.F.R. § 727.203 (1984)[5] had been triggered under parts (a)(1) and (a)(2). R. 79. The blood gas test results, although numerically adequate to trigger the "interim presumption" under part (a)(3), were rejected by the ALJ because they had been considered by the doctors to be influenced by the altitude of the test site and therefore, in the ALJ's view, did not "demonstrate the presence of an impairment in the transfer of oxygen from the lung alveoli to the blood ..." as required by the terms of the "interim presumption." R. 79; 20 C.F.R. § 727.-203(a)(3) (1984).

Having found that the "interim presumption" had been triggered, the next step for the ALJ was to determine whether or not Kaiser Steel had successfully rebutted the

4. Black Lung claims were originally handled by the Social Security Administration. In 1972 the Social Security Administration promulgated an "interim presumption" at 20 C.F.R. § 410.490 (1984) in order to expedite the processing of Black Lung claims. After jurisdiction over Black Lung claims was transferred to the Department of Labor on July 1, 1973, the success rate of miner's Black Lung claims decreased dramatically. Congress attempted to remedy this situation with the Black Lung Benefits Reform Act of 1977, which directed that the criteria to be applied by the Department of Labor in evaluating these claims "shall not be more restrictive than the criteria applicable to a claim filed on June 30, 1973 ...." Pub.L. No. 95–239, § 2(c), 92 Stat. 96, codified at 30 U.S.C. § 902(f)(2) (1982). The Department of Labor responded by promulgating the "interim presumption" at 20 C.F.R. § 727.203 which is the applicable law in the instant case. 43 Fed.Reg. 36772, 36825 (August 8, 1978). This "interim presumption" was replaced by the final regulations at 20 C.F.R. Part 718 (1984) on February 29, 1980. See 45 Fed.Reg. 13678 (Feb. 29, 1980). See generally Solomons, A Critical Analysis of the Legislative History Surrounding the Black Lung Interim Presumption and a Survey of its Unresolved Issues, 83 W.Va.L.Rev. 869 (1981).

5. The "interim presumption" at 20 C.F.R. § 727.-203(a) provides in part as follows:

(a) Establishing interim presumption. A miner who engaged in coal mine employment for at least 10 years will be presumed to be totally disabled due to pneumoconiosis, ... arising out of that employment, if one of the following medical requirements is met:

(1) A chest roentgenogram (X-ray), biopsy, or autopsy establishes the existence of pneumoconiosis (see § 410.428 of this title);

(2) Ventilatory studies establish the presence of a chronic respiratory or pulmonary disease ... as demonstrated by values which are equal to or less than the values specified in the following table:

[for a miner's height of 68″ or 69″, $FEV_1$ must be equal to or less than 2.4 L, and MVV must be equal to or less than 96 L/M.]

(3) Blood gas studies which demonstrate the presence of an impairment in the transfer of oxygen from the lung alveoli to the blood as indicated by values which are equal to or less than the values specified in the following table:

[for a $PCO_2$ value of 32, $PO_2$ must be equal to or less than 68.]

(4) Other medical evidence, including the documented opinion of a physician exercising reasoned medical judgment, establishes the presence of a totally disabling respiratory or pulmonary impairment;

\* \* \* \* \* \*

presumption by any of the four methods specified in part (b).[6] The ALJ found in this regard that the employer had failed to prove that the claimant did not have pneumoconiosis (thus failing to establish a method four rebuttal), and that the employer failed to prove that the claimant's disability arose from causes other than pneumoconiosis and therefore from causes other than his coal mine employment (thus failing to establish a method three rebuttal). With the "interim presumption" thus invoked and not rebutted, the ALJ found Sena to be entitled to disability benefits. The ALJ's decision was affirmed by the Benefits Review Board.

Kaiser Steel now raises a number of contentions on appeal, challenging the ALJ's findings and challenging the constitutionality of the "interim presumption" itself. These contentions raise three distinct issues for our consideration: (1) Was the ALJ's finding that the "interim presumption" had been invoked based on substantial evidence? (2) Was the ALJ's finding that the "interim presumption" had not been rebutted based on substantial evidence? (3) Does the "interim presumption" violate the Equal Protection Clause and the Due Process Clause of the United States Constitution?

*Invocation of the "Interim Presumption"*

■ Our inquiry in the factual matter is limited to the question whether the ALJ's findings were based on substantial evidence. If so, we must affirm his decision. See *Kaiser Steel Corporation v. Director, Office of Workers' Compensation Programs and Jesse Sainz*, 748 F.2d 1426, 1429 (10th Cir.1984), and cases cited therein. Upon close examination of the record, which included test reports, doctors re-

ports, and testimony before the ALJ, we hold that the ALJ's invocation of the "interim presumption" under parts (a)(1) and (a)(2) was based on substantial evidence. Kaiser Steel challenges the ALJ's findings on several fronts, claiming, for example, that since the ALJ threw out the blood gas test results, he also should have thrown out the ventilatory test results, and that there was no medical evidence in the record revealing "restrictive ventilatory defect." Br. at 15–17. We find these contentions unpersuasive. We also note that Kaiser Steel does not challenge the validity of the X-ray results, which alone would be sufficient to invoke the "interim presumption."

*Rebuttal of the "Interim Presumption"*

■ Kaiser Steel claims that it successfully rebutted the "interim presumption" under both method three (20 C.F.R. § 727(b)(3) (1984)) and method four (20 C.F.R. § 727.203(b)(4) (1984)). As Kaiser Steel puts it: "Kaiser met its burden by offering in rebuttal unequivocal medical evidence from all of the doctors ... that Sena did not have pneumoconiosis and that he was not impaired due to a pulmonary problem arising out of coal mine exposure." Br. at 20. We disagree. As a preliminary matter, we follow our holding in *Sainz* that rebuttal under any of the four methods provided in part (b) of the "interim presumption" is not accomplished merely by going forward with any evidence at all; the presumption operates to shift the burden of persuasion. *Sainz, supra,* 748 F.2d at 1430. To accomplish rebuttal under method three, Kaiser Steel would have had to show that "the evidence establishes that the total disability or death of the miner did not arise in whole or in part out of coal

---

6. 20 C.F.R. § 727.203(b) provides:

(b) *Rebuttal of interim presumption.* In adjudicating a claim under this subpart, all relevant medical evidence shall be considered. The presumption in paragraph (a) of this section shall be rebutted if:

(1) The evidence establishes that the individual is, in fact, doing his usual coal mine work or comparable and gainful work (see § 410.412(a)(1) of this title); or

(2) In light of all relevant evidence it is established that the individual is able to do his usual coal mine work or comparable and gainful work (see § 410.412(a)(1) of this title); or

(3) The evidence establishes that the total disability or death of the miner did not arise in whole or in part out of coal mine employment; or

(4) The evidence establishes that the miner does not, or did not, have pneumoconiosis.

mine employment." 20 C.F.R. § 727.-203(b)(4) (1984). Kaiser Steel attempted to meet this burden with testimony by Dr. Keil that Sena was not disabled by pneumoconiosis. This opinion, however, was based on Dr. Keil's assumption that simple pneumoconiosis is not disabling, which is in direct conflict with a basic premise of the Act. *Sainz, supra,* 748 F.2d at 1430, and cases cited therein. Therefore, just as in the *Sainz* case, the ALJ properly rejected that part of the testimony that was based on the offending opinion. R. 81. With this testimony rejected, Kaiser Steel was left with nothing more than scattered testimony about possible alternative causes of the claimant's health problems, such as "bellows disease" or heart problems. Such testimony was not enough to accomplish a method three rebuttal, however, for the simple reason that there was no viable evidence ruling out pneumoconiosis as at least a contributing cause of the claimant's disability.

In order to accomplish a method four rebuttal, Kaiser Steel would have had to show that "the evidence establishes that the miner does not, or did not, have pneumoconiosis." 20 C.F.R. § 727.203(b)(4) (1984). Notwithstanding Kaiser Steel's bare allegations that all of the evidence in the record shows that Sena did not have pneumoconiosis, our examination of the record dictates a conclusion to the contrary. The doctors' reports and testimony contain contradictions and equivocations; the unanimity of opinion that Kaiser Steel would have us believe the record contains is nonexistent.

*Constitutionality of the "Interim Presumption"*

We now consider the one issue that was not covered in the *Sainz* case, that being whether the "interim presumption" withstands constitutional scrutiny under the Equal Protection Clause and the Due Process Clause. We are not unmindful of the rule we cited in *Sainz* prohibiting unnecessary decisions on constitutional questions, *Sainz, supra,* 748 F.2d at 1431. We therefore confine ourselves to consideration of parts (a)(1) and (a)(2) of the "interim presumption," inasmuch as these were the only two parts the claimant qualified under.

■ The "interim presumption" implements a civil statute involving economic regulation, and so the appropriate scrutiny under both the Equal Protection and Due Process clauses is the "rational connection" test. *Usery v. Turner Elkhorn Mining Co.,* 428 U.S. 1, 28, 96 S.Ct. 2882, 2898, 49 L.Ed.2d 752 (1976); *accord, Leary v. United States,* 395 U.S. 6, 89 S.Ct. 1532, 23 L.Ed.2d 57 (1969); *United States v. Gainey,* 380 U.S. 63, 66, 85 S.Ct. 754, 757, 13 L.Ed.2d 658 (1965); *Tot v. United States,* 319 U.S. 463, 467–68, 63 S.Ct. 1241, 1244–45, 87 L.Ed. 1519 (1943); *Mobile, J. & K.C.C. Co. v. Turnipseed,* 219 U.S. 35, 43, 31 S.Ct. 136, 138, 55 L.Ed. 78 (1910).

The rational connection test was articulated in *Tot, supra,* 319 U.S. at 467–68, 63 S.Ct. at 1245:

> Under our decisions, a statutory presumption cannot be sustained if there be no rational connection between the fact proved and the ultimate fact presumed, if the inference of the one from proof of the other is arbitrary because of lack of connection between the two in common experience.

The Supreme Court elaborated on the test in *United States v. Gainey,* 380 U.S. 63, 67, 85 S.Ct. 754, 757, 13 L.Ed.2d 658 (1965):

> The process of making the determination of rationality is, by its nature, highly empirical, and in matters not within specialized judicial competence or completely commonplace, significant weight should be accorded the capacity of Congress to amass the stuff of actual experience and call conclusions from it.

The "interim presumption" is, of course, an administrative regulation and not a statute enacted by Congress, but, inasmuch as there is no challenge to the regulation's validity in implementing the congressional directives of the Black Lung Benefits Re-

form Act of 1977,[7] we will apply the "rational connection" test directly to parts (a)(1) and (a)(2) of the "interim presumption." *Atwood's Transport Lines, Inc. v. United States*, 211 F.Supp. 168, 170 (D.D.C.1962), *aff'd*, 373 U.S. 377, 83 S.Ct. 1312, 10 L.Ed.2d 420 (1963).

Kaiser Steel contends that the required rational connection does not exist between the basic facts (ten years of experience as a coal miner and either an X-ray showing simple pneumoconiosis or ventilatory test results) and the presumed fact (disability due to pneumoconiosis). This contention is based primarily on two medical propositions: (1) that simple pneumoconiosis is not disabling, and (2) that the qualifying test values are useless because they do not take into account the subject's age and sex. Neither of these propositions, however, are universally accepted by the medical profession.

The first proposition is, as mentioned earlier, directly contrary to a basic premise of the Act, a premise established by Congress after lengthy investigation into the state of medical knowledge at the time. *See Alabama By-Products v. Killingsworth*, 733 F.2d 1511, 1517–18 (11th Cir.1984); *Jones v. The New River Company*, 3 BLR 1–199, 1–204–205 (BRB 1981). We therefore follow the *Killingsworth* and *Jones* cases in finding part (a)(1) of the "interim presumption" to be constitutional.

The second proposition is essentially nothing more than a quarrel with the particular numbers chosen as a threshold. These numbers were keyed to the "Kory-AMA" tables that had previously been proven effective when used by the Social Security Administration. They were adopted by the Department of Labor after

further inquiry into their validity during rulemaking proceedings.[8] The Benefits Review Board had occasion to examine the "rational connection" between the ventilatory test numbers and claimant's disability in the case of *McCluskey v. Zeigler Coal Company*, 2 BLR 1–1248 (BRB 1981), and came to the following conclusion:

> In light of the evidence before Congress and the Department of Labor, we cannot agree with the employer that there is no medically established basis for concluding that the table values listed in 20 C.F.R. § 727.203(a)(2) represent totally disabling breathing dysfunctions. Congress has determined that the values are sufficient to invoke a rebuttable presumption of total disability due to pneumoconiosis and the regulations serve to implement the Congressional determination.

*McCluskey v. Zeigler Coal Company*, 2 BLR 1–1248, 1–1268 (BRB 1981).

We follow the *McCluskey* case in our conclusion that the numbers contained in the ventilatory test tables are neither arbitrary nor without rational basis. "A classification having some reasonable basis does not offend against that [Equal Protection] clause merely because it is not made with mathematical nicety...." *Lindsley v. Natural Carbonic Gas Co.*, 220 U.S. 61, 78, 31 S.Ct. 337, 340, 55 L.Ed. 369 (1911). Our constitutional inquiry therefore ends, with the holding that part (a)(2) of the interim presumption also passes constitutional muster.

AFFIRMED.

---

7. 20 C.F.R. Part 727 are the implementing regulations for the Black Lung Benefits Reform Act of 1977. *Director, Office of Workers' Compensation Programs v. Gurule*, 653 F.2d 1368, 1369 (10th Cir.1981). The regulations were promulgated pursuant to 30 U.S.C. § 932(h) (1982) and the restriction at 30 U.S.C. § 902(f)(2) (1982). See footnote 4.

8. "The comment that the pulmonary function tables show no disability and should be elimina-

ted is rejected. The pulmonary function tables to be used in the application of the interim presumption were developed by the Social Security Administration. They have proved to be an effective measure of disability. These tables were the subject of Congressional inquiry, and in light of that inquiry have been mandated by the 1977 amendments." 43 Fed.Reg. at 36826 (August 18, 1978).